JACK COFFEY

*v.*

STATE OF TENNESSEE (two cases).

(*Knoxville,* September Term (May Session), 1959.)

Opinion filed September 9, 1960.

Mark C. Hicks, Jr., Jonesboro, Banks, Street & Banks, Elizabethton, for plaintiff in error.

Thomas E. Fox, Assistant Attorney General, for the State.

Mr. Justice Tomlinson delivered the opinion of the Court.

This is the appeal in error of Jack Coffey from a conviction of (1) assault and battery upon Russell Mathes

and (2) official oppression of Russell Mathes. Coffey was a Constable of Washington County at the time of the alleged offenses. The two cases were tried at the same time. Each conviction is based upon the same evidence. Coffey's first insistence on this appeal is that the evidence preponderates against the verdict in each case.

This difficulty was the aftermath of a party at the home of Russell Mathes and wife to celebrate Father's Day. About thirty people, mostly wives and husbands, were there. They were all colored people.

As a result of a complaint about noise at the Mathes home, Hunter Keys, the town officer for Jonesboro, went to the Mathes home probably after 1:00 A.M. and informed Mathes' wife as to the complaint. He suggested, and she agreed, that it was time to break up the party. The party was held at the late hour because it was Saturday night preceding the advent of Father's Day at midnight.

Some time later, Keys received another complaint. He then drove to within about 700 feet of the Mathes home, parked, and listened for awhile to considerable talking and hollering from, and around, the home. Then he radioed for another officer. In due course Coffey arrived, and the two officers along with a third proceeded to the Mathes home. Coffey then abruptly entered through the kitchen door without knocking. Keys entered from the front. Four women were washing dishes in the kitchen when Coffey entered. Their testimony is that he carried a pistol in his hand and advised them that all in the house were under arrest.

Some considerable time before the entry of these officers into the house Mathes had gone to his bedroom for

the purpose of getting his fretting baby to sleep. He, too, fell asleep across the bed and was asleep when Coffey entered his home, and then this bedroom. It is appropriate here to note that a substantial amount of whiskey, along with food, was brought there that night for this party. Most of those present partook of this whiskey, but none of them was intoxicated, unless it was Mathes. Though he denies it, the best evidence is that Mathes was intoxicated when he first went to this bedroom and had not become entirely sober when he was awakened by Coffey.

When Coffey entered the bedroom he shook Mathes awake. Mathes then inquired as to ''what in the hell was going on''. Upon being informed by Coffey that he was going to take him to jail Mathes inquired why, and as to whether he had a warrant. When Coffey said he had no warrant, Mathes told him to get out of his house.

There is much evidence that Coffey did some cursing in this bedroom and threatened Mathes with his pistol. Officer Keys says he heard no cursing, and did not see a pistol. Coffey says that he and Mathes ''got into a pretty good heated argument there''. In the course of that argument, according to several witnesses, Coffey's pistol was fired when Mathes knocked it out of Mathes' face. Coffey denies that his pistol was ever fired. Somebody's pistol was fired during this argument. Coffey had his pistol in his hand during that time according to several witnesses. At least two of them saw the gun fire, they said, and one of them says she begged Coffey not to shoot again. She was erroneously under the impression that Coffey had intentionally fired the shot.

264

In the course of this argument, policeman Keys, according to Coffey, "hit me on the shoulder" and said "Jack, let's get out go get a warrant". The two officers then went to the front yard or the road in front, and radioed for a warrant and additional officers.

In the course of a little while a constable named Keplinger and one from Greene County arrived. Keplinger got his shogun and took a position in the yard. Coffey took a position on the other side of the yard near the front porch. While they were thus stationed, Mathes walked out on the porch. He says that he did this to make inquiry as to why an officer was standing in his front yard with a shotgun. Coffey and Keplinger say that Mathes' inquiry was belligerent and accompanied with profanity. All the State's evidence is to the contrary.

There is an abundance of evidence to the effect that when Mathes came out on the porch, Coffey jerked him to the pavement, and as Mathes struggled to get up, Coffey struck him in the head and face a number of times with metal knucks. After Mathes was released from jail some hours later he was carried to a doctor's office where a number of stitches were taken to close wounds on his head and face.

There are several State witnesses who corroborate Mathes in his statement that Coffey jerked him from the steps down to the pavement and began "beating" him. Their testimony is that Mathes had no chance to resist, that each time he tried to get up Coffey would hit him again. Coffey admits having the knucks, but says that he doesn't "even know if I hit him with the steel knucks".

The testimony of Coffey is that when Mathes walked to the front porch and proceeded down to the second step

he, Coffey, "reached and got him by the belt with my left hand" and said "you are out of the house now—although we have sent after a warrant we don't need one since you are outside", and that he then importuned Mathes to submit to arrest. Then it is, he says, that Mathes, cursing, grabbed him and they went to the ground in a struggle; that after some difficulty during which Mathes undertook to get Coffey's pistol, he, Coffey, was able to subdue him, and complete his arrest. On the next morning Coffey charged him in a criminal warrant with resisting arrest.

Keplinger was the only other of the officers present who testified that he saw the struggle on the pavement or in the yard, except that officer Keys says he did see Coffey on top of Mathes. Keplinger's testimony is that Mathes, while standing in the house, cursed Keplinger and invited him to "come in and get me. You have got no warrant", but that he made no reply. Then he says Mathes came to the front porch and, while cursing, walked down to about the first or second step when Coffey walked up, took him by the belt and advised him that he was under arrest saying "you ain't in the house"; that then Mathes hit or shoved Coffey, and the two went down scuffling; that he stood there to keep the other colored people off of Coffey until, to use his language, "the fight was over".

About thirteen or fourteen Negroes were taken by these officers that night to the jail and held until they made bond some time the next morning. Coffey said that the others "got away". Following their trial the next day all of these people were discharged, except Mathes. He was bound over to the grand jury. That tribunal did not indict him.

Mathes' wife testified that after Coffey had taken her husband to the car he returned to the house and told her that he was taking her to jail; that when she told him that she didn't have anybody with whom to leave her two babies he replied that "you have raised them up this far, you can raise them the rest of the way in jail". Coffey denies this.

Policeman Keys testifies that when Coffey brought Mathes' wife to the car, Keys asked him what he was going to do about these babies; that Keys replied that he wasn't going to do anything. Keys then testified that he told Coffey, "so I said, 'I am' ", and told her to get out of the car and stay with her children.

The evidence preponderates rather heavily in favor of a finding that Coffey entered the Mathes home that night in a manner quite unbecoming an officer and conducted himself towards Mathes and the others therein in a most menacing manner. There is no question but that the previous conduct of Coffey when he entered the home and bedroom was resented by Mathes, and it is reasonable to conclude that he carried this resentment with him when he walked out on the front porch. Coffey admits that he and Mathes engaged in a "heated argument" in that room and that when told to get out, he did so on the advice of his associate officer.

Six or seven State witnesses testified that when Mathes came within reach, Coffee immediately grabbed Mathes and jerked him down to the pavement and began "beating him". A permissible inference from this testimony is that Coffey was in the same humor as when he left the house upon orders of Mathes following the "heated argument" as to his authority to be in there. When he grabbed

Mathes on the steps, as all these witnesses testify, it is agreed that he at once reminded Mathes that the latter was not then in his house.

Another reasonable conclusion is that Mathes did struggle with Coffey after they fell to the pavement. Whether he was resisting arrest or seeking to protect himself from the rather violent attack which the State witnesses say Coffey was making upon him was a question for the jury. That Coffey was in an angry mood at the time may very well be concluded, too, by his effort to take to jail the mother of the two Mathes babies, notwithstanding the fact that these babies would be left alone in the house.

Section 39-3203, T.C.A. provides punishment by fine and jail sentence of any person who "by color of his office, willfully and corruptly oppress any person, under pretense of acting in his official capacity". This offense is termed "official oppression".

It is said in *State v. Fields,* 8 Tenn. 137, 141-142, "that the word 'oppressively' is a word of very vague import, upon which alone to found the judgment of a Court"; that, therefore, the question must be asked "but how did he make it operate oppressively?" The Court then answers this question as follows:—"Set forth the matters in which the oppression consisted".

The official oppression indictment here alleges that the matters in which the oppression consisted were that "under pretense of acting in his official capacity" Coffey did unlawfully, willfully and maliciously, etc. assault Mathes with metal knucks with the intention of murdering him. The first question, therefore, is whether such

an assault may legally be regarded as an act of official oppression.

Nothing has been found one way or the other as to the question stated in the Tennessee decisions. The State's brief cites 67 C.J.S. Officers sec. 133 p. 434, where it is written that "the statutory crime of oppression has been described as an unlawful use of authority, and * * * committed by * * * an unlawful act of accused". A number of cases under the subject "Oppression" are mentioned in Vol. 29 Words and Phrases, p. 606. Among them is the California case of *Baker v. Peck,* 1 Cal.App.2d 231, 36 P.2d 404, 406, holding that oppression "is an act of subjecting to cruel and unjust hardship; an act of domination". Then is cited the Texas case of *Yarbrough v. Brookins,* Tex.Civ.App., 294 S.W. 900, 904, as defining oppression as "being act of cruelty * * * or excessive use of authority". It also cites the New York case of *People ex rel. Reardon v. Flynn,* 58 Misc. 621, 111 N.Y.S. 1065, as holding a police officer guilty of oppression in entering a saloon and without justification pointing a pistol at a woman who was there, detained her against her will and committed acts whereby she was injured.

No decisions to the contrary of those above mentioned have been found. It seems, therefore, that persuasive authority, as well as principle, requires a conclusion that the assault alleged to have been made by Coffey upon Mathes under the circumstances alleged falls within our official oppression statute.

The next question, therefore, is whether the evidence preponderates against the jury's finding that Coffey committed the acts alleged in the indictment.

▮▮ It is, of course, a fact that by the use of metal knucks Coffey did inflict at least painful wounds upon the body of Mathes. The testimony of the State witnesses, if their testimony is to be believed, together with the circumstances under which the blows were inflicted, permit a conclusion that Coffey pretending to act in his capacity as a constable maliciously and in anger inflicted these blows. The jury believed these witnesses. Its conclusion as to their credibility is, of course, binding on this Court under the circumstances here. And it is the opinion of the Court that the evidence does not preponderate against that which the jury accepted as the truth.

Official oppression is a misdemeanor in office. Section 39-3219, T.C.A. provides that if an officer is convicted of a misdemeanor in office he shall, in addition to the punishment prescribed for such offense, ''be removed from his office, and shall forever thereafter be disqualified from holding office under the laws and Constitution of this state''. Accordingly, in addition to the fine ($50) assessed by the Court it directed Coffey's removal from office and that he be forever disqualified from holding an office under the laws of this State.

▮ One of Coffey's assignments of error is that the Court erred in applying sec. 39-3219, T.C.A. The reasoning of Coffey's brief in support of this contention is that the term of office during which the offense was committed had expired and that this provision of forfeiture and disqualification does not apply when that term of office has ended.

Perhaps counsel had in mind a suit which is brought for the purpose of having an incumbent removed from office as the relief primarily sought. It is uniformly held

in such a case that the question becomes moot if the term of office expires pending the suit; hence, that the suit will not be further entertained. But such is not the present case.

The indictment in the present case charges Coffey with the commission of a criminal offense. The fact that the term of office in which he committed that offense has ended is not a forgiveness for offending. If that trial, when had, results in a conviction the law prescribes that a part of the punishment shall be that the offender be forever thereafter disqualified from holding office. In *State ex rel Chitwood v. Murley*, 202 Tenn. 637, 308 S.W. 2d 405, 408-409, this Court, in discussing this distinction approved the following statement in the opinion that the Chancellor had rendered in the case, to-wit:

"'Unless there is a violation of a Statute which contained a provision declaring the violator to be ineligible beyond the term of office in which the violation occurred, such as the personal interest Statute, the official cannot be removed in a subsequent term for matters occurring in a prior term. As pointed out by defendants' counsel, we are here dealing with the question of allegations of misconduct during the prior term and not with a situation which would extend beyond ordinary misconduct and fall within the categories contemplated by the statutory eligibility provisions.' "

This assignment of error is overruled.

█ The insistence that the conviction of Coffey for assault and battery, as well as the conviction of official oppression, constitutes double jeopardy is well taken. "Where two or more offenses of the same nature are by

statute carved out of the same transaction, and are properly the subject of a single investigation, an acquittal or conviction for one of the several offenses bars subsequent prosecution for the others''. *Dowdy v. State,* 158 Tenn. 364, 366, 13 S.W.2d 794.

The judgment in the assault and battery case will be set aside and that suit abated. The judgment in the official oppression case will be affirmed.